# BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606

Wendi E. Sloane
(312) 984-3166
Voice Mail Ext. 4166
wendi.sloane@bfkn.com

Telephone (312) 984-3100
Facsimile (312) 984-3150

February 18, 2011

**BY FACSIMILE (212) 805-7949**

Honorable P. Kevin Castel
Daniel Patrick Moynihan
United States Court
500 Pearl Street
New York, NY 10021

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE DOCKETED 3/7/11
```

Re: *GO SMiLE, Inc. v. Dr. Jonathan B. Levine, D.M.D., P.C., et al.*,
10-CIV-8663 (PKC (DCF)

Dear Judge Castel:

Pursuant to this Court's February 17, 2011, Order, GO SMiLE, Inc. hereby submits its written closing argument.

The evidence adduced during the preliminary injunction hearing establishes that GO SMiLE is entitled to a preliminary injunction. The preponderance of the evidence proves that, (a) absent a preliminary injunction, GO SMiLE will suffer irreparable injury and (b) GO SMiLE has a likelihood of success on the merits of its trademark infringement claim against Defendants and/or has demonstrated a sufficiently serious question going to the merits of its trademark infringement action to make them fair ground for litigation and the balance of hardships tips decidedly toward GO SMiLE.

### A. Absent a Preliminary Injunction, GO SMiLE Will Suffer Irreparable Injury.

As this Court is well aware, in a trademark infringement action, a showing of likelihood of confusion establishes irreparable injury. Here, GO SMiLE has presented uncontroverted evidence that absent an injunction, it will suffer damage to its reputation for high quality, safe and effective teeth whitening products sold under its GO SMiLE and other trademarks using the GO prefix. Consumers are concerned with the safety and efficacy of teeth whitening products. (Transcript of the January 20, 2011 Hearing ("Tr. I") 28:24-29:5; Transcript of the February 16-17, 2011 Hearing ("Tr. II") 105:17-18. GO SMiLE has established a reputation for high quality products sold under its trademarks. (Tr. II 97:14-16.)

GO SMiLE's reputation for safe, quality and effective products is unquestionably at risk if consumers are likely to confuse Defendants' GLO-branded products as a product of GO SMiLE. And, the evidence introduced at the hearing establishes that there is a likely of confusion as to source – confusion that Defendants intended to created in their selection of the GLO trademarks, in the selection of the trade dress for the GLO-branded products, and in the

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 2

marketing plans for the GLO-branded products. It is not surprising that, in the two weeks since Defendants launched their GLO-branded products, GO SMiLE has already discovered two instances of actual confusion.

Before the August 2010 launching of the GO WHITER light device on QVC, GO SMiLE conducted stringent clinicals and consumer testing. (Tr. I, 29:8-21; PX 170, PX 180). GO SMiLE's GO WHITER light device passed QVC's stringent quality control requirements. (Tr. 29:22-25; 30:7.) Consumer feedback on the GO WHITER device has been extremely positive. (PX. 267; PX 267A.) The overall consumer rating of the product as of February 15, 2011 was approximately 4 out of 5 stars. (*Id.*) While there have been some negative reviews, none of them raise concerns of safety or quality. To the contrary, in the two weeks since Defendants' launched the GLO branded products, consumers have raised significant complaints about the quality, safety and efficacy of the products. (PX 264.) Reviewing customers have complained about the leaky G-Vials, tooth sensitivity and/or burns and blisters on their lips, mouth and gums. (*Id.*) Many reviewing customers have returned the product, some chastising HSN for selling it. (*Id.*)

### B. GO SMiLE Has Met Its Burden To Establish A Likelihood of Confusion.

It cannot be disputed that GO SMiLE owns a design mark registration for the GO trademark as well as fourteen registrations for, and three published applications to register, trademarks beginning with the prefix GO, nine of which are not followed by the word SMILE. (2/16/11 Stipulation, ¶ 7.) The registered trademarks and approved applications are *prima facie* evidence that GO SMiLE's trademarks are entitled to protection. Defendants have not challenged the validity of the GO SMiLE trademarks. The evidence establishes that each of the *Polaroid* factors either weigh in favor of GO SMiLE or are neutral.

   **1. Strength of the GO SMiLE GO-based Trademarks.** The evidence demonstrates that this factor weighs in GO SMiLE's favor. It is undisputed that the Patent and Trademark Office ("PTO") registered the GO-based marks (and approved for registration GO DAILY, GO WHITER and GO VENEER) without requiring GO SMiLE to submit proof of secondary meaning or disclaim the GO component. As such, the PTO has found plaintiff's GO-based marks to be at least suggestive, and the marks start out as moderately strong.

It is undisputed that GO SMiLE has strengthened its family of GO-based trademarks though extensive advertising and promotion, through length of use, sales, and active policing. While Dr. Levine was the president of GO SMiLE, the company spent millions of dollars advertising and promoting is marks. (Tr. II 25:10-13; PX 187; 187B.) Since 2008, GO SMiLE has spent approximately $2.5 million dollars for the advertising and promotion of the products sold under its GO-based trademark, resulting in hundreds of millions of impressions. (Tr. II 252:24; 253: 7-254:9; PX 167; PX 167A.) GO SMiLE's gross sales in 2010 were approximately $13 million. (Tr. II, 252:9-12.) GO SMiLE has actively and policed its GO-based trademarks. (Stipulation ¶¶ 14-40; PX 162, 163, 163A, 187, 187A, 186, 186A; 192, 192A, 192B; 190; 191, 193, 194, 194A, 194B; 195; 200, 203; 203A). These policing

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 3

activities have not been limited to third party use of GO SMILE. Both while Dr. Levine was president of GO SMiLE and after his departure, GO SMiLE prevented dilution of its family of trademarks by preventing third party use of GLOSMILES, GO WHITE, GloWhiteSmiles, GO TOUCH, GLO WHITENING, GO RELAXED and GO FOR GLOW/GO4GLOW.

GO SMiLE's efforts have been successful. Defendants introduced no evidence of any trademark for oral care of teeth whitening consisting of or containing the GO or GLO trademark other than those of GO SMiLE and trademarks used by Defendants or their affiliated entity, GloScience, LLC. As such, GO SMiLE's GO-based trademark are entitled to a broad zone of protection.

Although Defendants dispute that GO SMiLE had created a family of GO-based trademarks, they presented no evidence to support their claim. Rather, the evidence establishes that, while president of GO SMiLE, Dr. Levine was creating the family of GO-based trademarks, authorizing GO SMiLE's counsel to assert this position, and even directing GO SMiLE's counsel to oppose a third-party application to register GO WHITE on the grounds it would create confusion with GO SMiLE's portfolio of GO-based marks. (Stipulation, ¶¶8; 14,15; PX. 187, 187A, 187; 187B; Tr. II, 4:15-5:1; 22:23-23:8.) GO SMiLE's current management has asserted that it has a family of trademarks since at least December 2008 (PX 203.)

   2.   **Similarity of the GO SMiLE's GO-based Trademarks and Defendants' GLO Marks.** This factor favors GO SMiLE. In addition to the argument raised in GO SMiLE briefs, Dr. Levine himself admitted that the only difference between GoSmile and GloSmile was a single letter – the "L". As such, the GLO marks and prefix are extremely similar in sight and sound. The addition of the word Brilliant, far from dispelling confusion, makes it more likely; it appears to be another of the GO family of marks. Dr. Levine is building a family of GLO-based marks. PX 261A, 261B, 261C, 261D, 261D, 261H, 261H(i), 261I, 262A, 262B, 262C, PX 242-250.

   3.   **Competitive Proximity.** This factor weighs in favor of GO SMiLE. GO SMiLE's GO WHITER light device and defendants' "GLO"-branded light device are directly competitive products, may be marketed and sold to the same consumers and will be sold through the same or similar marketing channels, including Sephora and television home shopping networks. There may be instances where GO SMiLE's GO WHITER light device and defendants' "GLO"-branded light device will be displayed side-by-side. (Stipulation ¶¶ 41-42.)

   4.   **Bridging the Gap.** This factor is neutral. The "bridging the gap" element of the Polaroid test is not relevant in this matter. (Stipulation ¶43.)

   5.   **Actual Confusion.** This factor also weighs in favor of GO SMiLE. As this Court has acknowledged, "it is self-evident that the existence of actual confusion indicates a likelihood of confusion. *Fruit-Ices Corp. v. CoolBrands Inter'l Inc.*, 335 F. Supp. 2d. 412,

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 4

427 (S.D.N.Y. 2004). Actual confusion exists where customers believe that the defendants' products are affiliated with those of the plaintiff. *Gross v. BareEscentuals Beauty, Inc.*, 641 F. Supp. 2d. 175, 187 (S.D.N.Y. 2008.) There is uncontroverted and credible evidence of actual confusion between products of GO SMiLE and Defendants' use of the GLO-trademarks, both before and after Defendants' launch of the GLO-branded products.

- In March 2010, GO SMiLE's lead sales executive, Angela Brass, was conducting a training session at the Sephora store in the San Diego Fashion Mall. A Sephora store employee approached her asking about GO SMiLE's light. At that time, GO SMiLE was working on a light, but has not engaged in any discussion about this product with Sephora. (Tr. II, 233:25-234:2; 234:6-22.) Several days later, Ms. Brass was conducting a training session at the Sephora Store in the Glendale, California Galleria Mall, and the store director asked her about GO SMiLE's new light device, which she referred to as GLO. (Tr. II 235:6-13, 235:20-25.)

- In late August or early September 2010, after the Sephora Store Directors' Meeting in Las Vegas, Ms. Brass encountered two more instances where Sephora store director approached Ms. Brass excited about the light device, which she said she had seen, asking questions as if it were a GO SMiLE product saying that it would be a great product for Sephora. Ms Brass had to clarify that it was not a GO SMILE product. (Tr. II, 236:1-237:4; 237:22-11.) Shortly thereafter, Ms. Brass was doing another training session in a Sephora store in Pasadena, California, when the store director asked her about the light she had seen in a another store director's office and how GO SMiLE was going to merchandize it. Ms. Brass had to clarify that this light was not a GO SMiLE product. (Tr. II, 238:19-239:7.)

- In October 2011, a potential customer wrote to the Dental Practice asking how to purchase the GLO Brilliant Smile Whitening System and maintenance ampoule (PX 87.) Ampoules are a distinguishing feature of the GO SMiLE Smile Whitening System. (Tr. II, 254:10-16.)

- After the launch of Defendants' GLO-branded products, GO SMiLE's CEO, Leslie Faust became aware of three more instances of actual confusion. A QVC vendor complaining that QVC allowed GO SMiLE to launch one brand on QVC (the GO SMiLE light device) and another on HSN (Defendants' GLO-branded light device.) (Tr. II, 242:16-244:5; PX 270.) A new GO SMiLE employee was asked by a Sephora employee about GO SMiLE new product that would be coming in called GLO. Both the new employee and the Sephora store director were confused as to the source of the GLO-branded light device. GO SMiLE's new marketing director was confused into believing the GLO-branded light was a "line extension" of the GO SMiLE product. (Tr. 244:6-247:16; PX 271.)

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 5

Defendants cannot refute these instances of actual confusion. Instead they rely on the survey prepared by Hal Perot. While GO SMiLE does not dispute that Mr. Perot is a qualified expert, this report is unreliable and is not probative of the likelihood of confusion. It should be excluded for a number of reasons, including the following fundamental flaws that make it unreliable.

The survey improperly defined the relevant universe. Rather than determining the actual potential purchasers of defendants' GLO-branded products (which are the same as those for GO SMiLE's products), Mr. Perot used the screening questions to define the universe. Screening questions are to ensure that respondents are within the relevant universe, not define it. Mr. Perot used screening questions to create a relevant universe by an even split between men and women: In fact, the relevant universe of purchasers is heavily female, not half male. (Tr. 251:1-258:20.) The average age for purchasers of products sold through QVC and HSN is mid-50's, and the average age of a Sephora purchaser is in the 30's. (Tr. 258: 21-7.)

Mr. Perot's study did not accurately reflect this demographic. His universe was an even split between men and women, with no age adjusgment. As such, it had no probative value. *Louis Vuitton Malletier v. Dooney & Burke, Inc.* 525 F. Supp. 2d 576, 629-631 (S.D.N.Y. 2007)\ (Reitter's screening criteria did little to assure that he got the right consumers for the survey. Therefore there is serious doubt that Reitter's rationale for using the malls he did was justified. Thus we have another flaw in the survey's methodology that decreases its reliability and probative value and correspondingly increases its prejudicial effect.); *Lon Tai Shing Co., LTD v. Koch+Lowy,* 1992 U.S. LEXIS 673, *8-9 (S.D.N.Y. 1992) (A survey performed for the purpose of determining actual confusion must encompass a universe of potential consumers who use the product): *Universal City Studios, Inc. v. Intendo Co.,* 746 F.2d 112, 118 (2d Cir. 1984).(Since LTS' survey failed to narrow the universe of consumers in order to encompass only the potential buyers of the products at issue, it fails to refute PAF's survey and its probative value is minimal); *Sears, Roebuck and Company v. Sears Realty Co., Inc.* 1990 U.S. Dist. LEXIS 16395, *42-43 (N.D.N.Y. 1990) (There is no indication that the universe of respondents selected in both surveys properly reflected the universe of potential consumers of gasoline and convenience stores products and services. No evidence was offered to demonstrate that the age or gender qualification chosen by Weilbacher correlated with the relevant consumer market....[f]inally, while the general population of males and females tends to be evenly divided, there is no proof that this assumption carries over into the population of consumers who frequent convenience stores.)

A trademark survey must approximate market conditions. *Trouble v. Wet Seal,* 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001.) The Perot Survey failed to do so. (PX 172, 277 200(a).)

6.   **Quality**. This factor also weighs in favor of GO SMiLE, for the reasons set forth in Section A. above. Dr. Levine has conducted nothing more than a pilot study of 12 subjects to measure shade changes. PX 35, 37, 55, 58, 66. Unlike GO SMiLE, he has not performed formal testing. This is particularly problematic given the potential of pulpal damage because of heat. (Id.)

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 6

7. **Sophistication.** This factor also weighs in favor of GO SMiLE. The only evidence is that preserved by Ms. Faust, that consumers are not overly sophisticated for this new type of product. Tr. I, 27:25-28:23. Defendants acknowledged the fact that HSN's audience is not sophisticated. (PX 142.)

8. **Bad Faith.** There is strong evidence that Defendants' intended to create confusion as to source in the selection of the GLO trademarks. Dr. Levine believed that GLO was similar to GO. He knew GO SMiLE called its primary product the GO SMiLE SMILE WHITENING SYSTEM, yet selected the mark GLO BRILLIANT SMILE WHITENING SYSTEM for defendants product. He used a robin's egg blue for the GLO/BRILLIANT Box, knowing that GO SMiLE considered robin's egg blue to be a source-identifying color. He intended to, and has created a "family" of GLO-prefixed marks, just as he did with GO SMiLE's GO-prefixed family of marks.

Dr. Levine also intentionally fostered consumer association between himself and the GO SMiLE-branded products. In addition to the evidence presented in GO SMiLE's briefs, in 2009, Dr. Levine had internet traffic for the www.gosmileaestetics domain redirected to www.jonathanbleune.com even though he knew GO SMiLE authorized use of www.gosmileaesthetics.com to elevate an association between the Dental Practice and GO SMiLE's GO-branded products. (Tr. 196:8-16; PX 23.)

The only evidence submitted to rebut GO SMiLE's claim that Dr. Levine developed a "GLO" family of marks intentionally to create confusion with plaintiff's "GO" family of marks is the testimony of Dr. Levine himself. We respectfully submit that Dr. Levine's performance on the witness stand revealed him to be an outright liar – one whose testimony should be rejected in its entirety. Among the more notable (and demonstrable) untruths to which Dr. Levine swore are:

- that the GLO Brilliant Whitening System had passed QVC's quality control testing. (Tr. II, 206: 21-22) Email correspondence between QVC officials and Dr. Levine established that this was not the case. PX 72, 153, 139, 149, 153, 155, 156, Tr. II, 226: 14-16.

- that as of July 2007, he was no longer using the domain name "gosmileasthetics.com." (Tr. II, 197). On redirect, Dr. Levine conceded that on August 4, 2009, long-after his formal affiliation with GO SMiLE had ceased, he authorized that traffic from the www.gosmileasthetics.com web page be "redirected" to his practice's www.jonathanblevine.com website. (PX 23)

- that the GLO Brilliant Whitening System had been "absolutely" approved and would have launched on January 21, 2011 but for the pendency of this lawsuit. (Tr. II, 223). In fact, emails between QVC and Dr. Levine's representative, Stuart Blinder, demonstrated that, among other things, QVC was insisting upon testing for the

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 7

> products' lip balm and that Dr. Levine never proceeded with the testing. (PX 153; Tr. II, 226)
>
> - that "in the first week of January, QVC ceased communicating with GLO Science regarding an alternate launch date." (Supplemental Interrogatory Response, dated January 18, 2011 at 2.) At the hearing, Dr. Levine conceded that as of December 21 (almost a month earlier than the supplemental interrogatory response), he had already decided not to launch on QVC, but instead to launch on HSN. (Tr. II, 226, 229-30; PX 156).
>
> - that prior to the August, 2010 launch of the GO Whiter system, GO SMiLE had no light-based teeth whitening system. (Tr. II, 231) Dr. Levine was then forced to admit that GO SMiLE did, in fact, have a light-based whitening system as early as 2008; it had been sold since that time on Steiner Cruise Lines (Tr. II, 232).
>
> - that when he parted ways with GO SMiLE in April, 2008, he did not retain a copy of the GO SMiLE brand guide. (Tr. II, 90.) When he was confronted with a copy of the document, however, he had no explanation for why it was in his files and produced in this litigation. (PX 212A; Tr. 90)

That Dr. Levine lied under oath, and particularly that he did so on these and other material issues, militates strongly in favor of rejecting the whole of his self-serving testimony.

### C. The Balance of Hardships Favors GO SMiLE.

For the same reasons, GO SMiLE will suffer irreparable injury, the balance of hardship weighs strongly in its favor. Defendants presented no evidence of any harm they would suffer if the injunction was entered.

Very truly yours,

Wendi E. Sloane

WES/sbs

cc: Kyle C. Bisceglie. Esq.
    Howard J. Smith, Esq.
    Ellen R. Werther, Esq.
    Bruce J. Ressler, Esq.
    David W. Dennenberg, Esq.
    Joshua S. Krakowsky, Esq.

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Honorable P. Kevin Castel
February 18, 2011
Page 8

    Michael A. Adler, Esq.
    Mark C. Zauderer, Esq.
    Jonathan D. Lupkin, Esq.
    Annaliese F. Fleming, Esq.
    Heather J. Macklin, Esq.
    Kimberly A. Pallen, Esq.

# FLEMMING, ZULACK & WILLIAMSON, LLP
## ONE LIBERTY PLAZA – 35TH FLOOR
## NEW YORK, NEW YORK 10006-1404

Telephone (212) 412-9500
Facsimile (212) 964-9200

## FACSIMILE COVER SHEET

| | |
|---|---|
| Date: | February 18, 2011 |
| Pages (Including Cover Sheet): | 9 |
| File No.: | 24689 |

**Please Deliver To:**

| | |
|---|---|
| Name: | Hon. P. Kevin Castel |
| Company: | SDNY |
| Facsimile No: | 212-805-7949 |
| Telephone No: | 212-805-0131 |

**From:**

| | |
|---|---|
| Name: | Anne B. Nicholson |
| Direct Dial: | 212-412-9584 |
| Facsimile No: | 212-964-9200 |

We have attached the written closing argument of the plaintiff. We appreciate the Court's extension of time for us to submit the attached.

Respectfully,

Anne B. Nicholson

cc: All Counsel (via e-mail with enclosure)

This communication is intended only for the use of the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (212) 412-9509. Thank you.

Our facsimile number is (212) 964-9200. Please contact the Copy Center if there are any problems with the transmission.